ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

DANIEL N. KASSABIAN (CABN 215249)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone:    (415) 436-7034
     Facsimile:    (415) 436-7234
     daniel.kassabian@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 22-00363-MMC |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| KELVIN VELASQUEZ, | Date:    June 28, 2023 |
| Defendant. | Time:    2:15 pm |
| | Ctrm:    7, 19th Fl |
| | Judge:    The Honorable Maxine M. Chesney |

## I.    SYNOPSIS

On April 12, 2023, defendant Kelvin Velasquez pleaded guilty to five counts for fentanyl and methamphetamine sales that took place on June 8, June 29, and July 13, 2022. These were all hand-to-hand sales at 7th and Mission and Streets, across from the San Francisco Federal Building. During the last sale, Mr. Velasquez had a co-conspirator deliver the fentanyl and methamphetamine while he was in Utah. Mr. Velasquez was arrested at the same street corner where he had sold drugs, the day after he returned from Utah. For the reasons set forth below, the government recommends a low-end Guidelines sentence of 30 months' imprisonment, followed by four years of supervised release, which is sufficient but no greater than necessary to meet the purposes of sentencing.

## II.      SENTENCING GUIDELINES CALCULATION

The government agrees with the offense conduct facts as set forth in the Presentence

Investigation Report (PSR).  PSR [ECF 19] ¶¶ 5-10.  The government also agrees with the Guidelines

offense level calculation in the PSR for Mr. Velasquez's conduct as follows:

a.      Base Offense Level, U.S.S.G. §2D1.1(a)(5):                                                  24
         *Offenses involved 49.82 grams of fentanyl*
         *and 63.3 grams of methamphetamine*

b.      Specific offense characteristics under U.S.S.G. § 2D1.1(b)(18)            -2
         *Defendant meets the requirements for safety valve*

c.      Acceptance of Responsibility under U.S.S.G. § 3E1.1:                          - 3

d.      **Total Offense Level:**                                                                               **19**

*See id*. ¶¶ 14-24.  Because of Mr. Velasquez's Criminal History Category (CHC) of I, *see id.* ¶ 28, the

Guidelines range for offense level 19 and CHC I is 30-37 months' imprisonment.  *Id.* ¶ 52.

In the plea agreement, the government promised to recommend a sentence at the low end of the

range associated with the Guidelines calculation.  *See* Plea Agreement [ECF 18] ¶ 15.

## III.     SENTENCING RECOMMENDATION

### A.      Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark"

of any sentencing process and are to be kept in mind throughout the process.  *See United States v. Carty*,

520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The

overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence

sufficient, but not greater than necessary."  *Carty*, 520 F.3d at 991 (citation omitted).  In accomplishing

that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

-    the nature and circumstances of the offense and the history and characteristics of the
     defendant;

-    the need for the sentence imposed to reflect the seriousness of the offense, to promote
     respect for the law, and to provide just punishment for the offense;

-    the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

-    the need to avoid unwarranted sentence disparities among defendants with similar
     records who have been found guilty of similar conduct.

**B.      Mr. Velasquez's instant offenses and his past criminal conduct show a lack of prior deterrence.**

Mr. Velasquez has made a living selling drugs on the streets of San Francisco for 1 ½ years—undeterred.  A sentence of 30 months imprisonment for that conduct is appropriate.  He was prosecuted federally because five prior arrests—on December 29, 2020; January 21, 2021; February 18, 2021; August 3, 2021; and April 20, 2022—show that Mr. Velasquez was unaffected by those arrests, state charges, or court stay away orders.  *See* PSR ¶¶ 29-33.  It is true that Mr. Velasquez has no criminal convictions—a fact he will no doubt raise as a mitigating factor.  But it is equally true that his prior offenses were not prosecuted to conviction because of an incorrect belief that simply having Mr. Velasquez subject to a court's oversight would cause him to stop.  It did not.  As set forth in the PSR, there is no question that these offenses had sufficient proof.  Each of them was a hand-to-hand drug transaction with an undercover police officer, *see id.*, just like the instant offenses before this Court.

**C.      Mr. Velasquez's crimes are serious, and the community needs protection from future, similar crimes by him**

Mr. Velasquez is a danger to the community—and he knows it.  This militates in favor of sentence of 30 months imprisonment.  The effect of his conduct to the community, where he was selling to drug addicts facing homelessness, and mental and physical health maladies, is inescapable to even the most casual observer who walks the streets of the Tenderloin and mid-Market neighborhoods of San Francisco.  These human beings are derided as "zombies" because their addictions have robbed them of their free will—and those are the survivors.  Author and journalist Sam Quinones, who recently presented to the Federal Bar Association,[1] aptly analogized selling fentanyl as "shooting into a crowd" given the foreseeable and potentially lethal impact.[2]  And Mr. Velasquez was comfortable making a

---

[1]   The program was *The Fentanyl Public Health Crisis: A Conversation with Journalist and Author Sam Quinones* and took place virtually and live at the San Francisco Federal Courthouse on June 12, 2023, with the Honorable Trina L. Thompson, United States District Judge, moderating.  *See* https://www.fedbar.org/event/northern-district-of-california-chapter-the-fentanyl-public-health-crisis-a-conversation-with-journalist-and-author-sam-quinones/.  Mr. Quinones's knowledge about the impacts of drug trafficking and use goes back to when he started journalism in the late 1980's. *See* https://samquinones.com/

[2]   U.S. Drug Enforcement Administration (DEA), Facts About Fentanyl (Feb. 23, 2022) *available at* https://www.dea.gov/resources/facts-about-fentanyl.

living from this tragedy that has become a crisis in the City, and across the country.

Another interesting fact about Mr. Velasquez's conduct is that he was out-of-town—in fact, he was out-of-state, in Utah—when he orchestrated the last sale of fentanyl and methamphetamine on July 13, 2022 for which he now stands convicted. *See* PSR ¶¶ 9-10. To the extent he had no pecuniary gain, as he claims, that is arguably *worse* than his prior personal drug dealing to make money. It demonstrates callousness—i.e., rather than just staying out of the drug business while he was far away in Utah, he was willing to distribute fentanyl *so someone else could make money* while causing further harm to *this* community in the process. A related fact, that cannot be ignored, is that Mr. Velasquez was arrested on the same street corner where all the charged distributions occurred. *Id*. It is true that Mr. Velasquez did not have any drugs on him at the time. And, he claims he returned to the San Francisco Bay Area to collect his belongings to relocate. *Id*. But he was not living at 7th and Mission Streets, he was selling drugs there. So the real reason for his return to that same street corner is obvious.

### D.     Mr. Velasquez's crimes call for a sentence that will deter him and others.

The need for specific and general deterrence supports a sentence of 30 months imprisonment. The government recognizes, as noted in the PSR, that Mr. Velasquez is young, lacks prior convictions, and grew up in a crime-ravaged area. The government respectfully submits that those factors justify a low-end Guidelines sentence, rather than a below Guidelines sentence as recommended in the PSR, or the credit-for-time-served sentence requested by his defense. Mr. Velasquez here admitted to selling fentanyl to undercover agents personally on two occasions. While the amounts he sold are certainly not large, they are significant, and must be viewed within the context of the broader fentanyl crisis ravaging San Francisco and the Tenderloin and mid-Market neighborhoods in particular.

A fentanyl-fueled crisis has led to the overdose deaths of hundreds of San Franciscans in 2022.[3] This was not a new trend. Between 2015 and 2020, deaths involving fentanyl in San Francisco increased 4,600%.[4] In 2020 and 2021, nearly two times more San Franciscans died of drug overdoses

---

[3] Nora Mishanec, *Overdose death toll in S.F. surpasses 500 people this year amid fentanyl-fueled drug crisis*, S.F. Chron., Nov. 23, 2022 *available a*t https://www.sfchronicle.com/sf/article/San-Francisco-passes-500-fatal-overdoses-so-far-17607009.php.

[4] "Overdose Deaths are Preventable: San Francisco's Overdose Prevention Plan," City and Cnty. of San Francisco Dep't of Pub. Health, at 4 *available at* https://sf.gov/sites/default/files/2022-09/SFDPH%20Overdose%20Plan%202022.pdf.

than from the COVID-19 pandemic.[5]  And in 2021 alone, 625 people died of drug overdoses in the city, the majority of which involved fentanyl.[6]  As Mayor London Breed stated in her announcement of a state of emergency on December 17, 2021, the "rapidly deteriorating conditions in the Tenderloin caused by the opioid crisis put the lives of San Franciscans in serious risk."[7]  To be sure, Mr. Velasquez is not solely responsible for these broader societal trends.  But he acted with indifference to his own role that is necessarily in furtherance of the trend, further plaguing the Tenderloin and mid-Market neighborhoods of San Francisco.  His conduct must be viewed in context.

It stands to reason that Mr. Velasquez sold more than just the three days in the instant offenses for which he stands convicted, or the five times he was previously arrested.  All of those were undercover police operations.  A rational inference is that he spent the majority of the past 1½ years selling drugs in San Francisco; there is nothing in the PSR to demonstrate otherwise.  Is it notable that Mr. Velasquez was apparently working a legitimate job in Utah for the three months prior to his arrest.  He has been healthy and able-bodied throughout—there is no suggestion in the PSR that he suffers from addiction or any other health issue, and it states quite the contrary.  See PSR ¶ 44.  Yet, Mr. Velasquez can only account for the last three months as engaging in productive work, instead drug trafficking that we know he did in the last 1½ years, which causes misery and harm to others.

A 30-month sentence would serve as a deterrent for fentanyl dealers who are similarly making money while causing the drug crisis in the Tenderloin and mid-Market neighborhoods.  Like any other unlawful employment driven purely by economic gain, the behavior of a drug dealer, like Mr. Velasquez, is motivated by a simple cost-benefit analysis.  A 30-month sentence helps shift that calculus and sends a message that Mr. Velasquez, and other drug dealers like him, are better off continuing to seek gainful employment then slipping into the easy money that comes from selling poison on the streets of San Francisco.

---

[5] Trisha Thadani, et al., *San Francisco's fentanyl crisis: A disaster in plain sight*, S.F. Chron., Feb. 2, 2022 *available at* https://www.sfchronicle.com/projects/2022/sf-fentanyl-opioid-epidemic/.

[6] City and Cnty. of San Francisco Dep't of Pub. Health, *supra* note 5, at 2.

[7] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021. *available at* https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin.

1

**IV.      CONCLUSION**

2

     For the foregoing reasons, the government recommends that the Court sentence Mr. Velasquez to

3

30 months imprisonment, four years supervised release, and a $100 special assessment.

4

DATED:  June 21, 2023                                    Respectfully submitted,

5

6

ISMAIL J. RAMSEY
United States Attorney

7

_____/s/_____

8

DANIEL N. KASSABIAN
Assistant United States Attorney
2092-6744-4992, v. 1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28